# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE MACK, | ) 1:04-CV-5408-SMS |
| | ) |
| Plaintiff, | ) DECISION AND ORDER DENYING SOCIAL |
| | ) SECURITY COMPLAINT (DOC. 1) |
| | ) |
| v. | ) ORDERING DIRECTING THE ENTRY OF |
| | ) JUDGMENT FOR DEFENDANT JO ANNE B. |
| JO ANNE B. BARNHART, | ) BARNHART, COMMISSIONER OF SOCIAL |
| Commissioner of Social | ) SECURITY, AND AGAINST PLAINTIFF |
| Security, | ) LESLIE MACK |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

Plaintiff is proceeding in forma pauperis and with counsel with an action in which Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security denying Plaintiff's application for benefits. Pursuant to 28 U.S.C. § 636(c), both parties have consented to the Magistrate's jurisdiction to conduct all proceedings, including ordering the entry of judgment. By order dated July 23, 2004, the case was assigned to the undersigned Magistrate Judge to conduct all further proceedings. The matter is currently before the Court on the parties' briefs, which have been submitted without oral argument to the Honorable Sandra M. Snyder, United States

1

Magistrate Judge.

PRIOR PROCEEDINGS

On January 16, 2002, Plaintiff applied for Supplemental Security Income (SSI), alleging disability since August 1, 2001, based on Bell's palsy, chronic dysplasia, diverticulitis, GERD (acid reflux disease), and diabetes. (A.R. at 85-90.) Plaintiff's claim was denied initially and on reconsideration. (Id. at 65-68, 70-74.) Plaintiff requested a hearing before an administrative law judge (ALJ) of the Social Security Administration (SSA). On March 17, 2003, Plaintiff appeared with an attorney and testified before the ALJ, Robert P. Ryan. (A.R. at 31, 33.) On August 12, 2003, the ALJ denied Plaintiff's application for benefits. (Id. at 22-28.) Plaintiff appealed the ALJ's decision to the Appeals Council. On January 13, 2004, the Appeals Council denied Plaintiff's request for review. (Id. at 8-9.)

On March 9, 2004, Plaintiff filed the complaint in the instant action; the administrative record was lodged by Defendant on July 7, 2004. On November 22, 2004, Plaintiff filed an opening brief. On December 28, 2004, Defendant filed a brief in opposition. On January 13, 2005, Plaintiff filed a reply brief.

ADMINISTRATIVE FINDINGS

Plaintiff's impairments, including diabetes, a depressive disorder, and borderline intellectual functioning, did not meet or medically equal a listed impairment in Appendix 1, Subpart P, Regulations Number 4. Plaintiff's subjective complaints were not fully credible and were not supported by the evidence of record. Plaintiff's residual functional capacity (RFC) was to lift twenty pounds occasionally and ten pounds frequently; sit for four

hours, and stand and walk for two hours each in an eight-hour
day; but not perform work that required interaction with the
public. Plaintiff did not have past relevant work; however, there
were a significant number of jobs that she could perform. Thus,
she was not disabled.

<u>ISSUES PRESENTED</u>

Reference to the briefs reveals that the following issues
are presented for decision:

1) Whether the ALJ failed to give appropriate weight to the
opinion of treating specialist and neurologist Hevor that
Plaintiff had multiple limitations that precluded prolonged use
of her hands and activities;

2) Whether the ALJ failed to develop the mental health
record fully;

3) Whether the ALJ erred at step three in failing to
acknowledge Plaintiff's obesity and in determining equivalency to
listing 9.08;

4) Whether the ALJ failed to follow pertinent legal
standards by failing to include in the RFC all Plaintiff's
impairments, including obesity, lumbar disc dessication and
bulging, mild carpal tunnel syndrome on the right, visual acuity
and field loss, right knee osteoarthritis, COPD with sinusitis,
TIA (transient ischemic attack), GERD, hypertension, status post
carcinoma, and dysplasia;

5) Whether the ALJ's mental RFC was supported by substantial
evidence; and

6) Whether the RFC is unclear regarding how long Plaintiff
can be on her feet.

3

1

FACTS

2    I. <u>Plaintiff's Testimony at the Hearing</u>

3    Plaintiff was born on July 31, 1957, and was forty-five at

4 the time of the hearing. She left school before the ninth grade

5 and had not worked during the past fifteen years except for an

6 attempt to perform in-home healthcare services the previous year

7 for a couple of months, which ended because Plaintiff was unable

8 to do it because the bending, lifting, and standing was hard on

9 her back and knees. (A.R. at 35.)

10    Plaintiff testified that she had Bell's palsy for over a

11 year; she suffered it nine or ten years before the hearing. It

12 affected her face, eye sight, and hearing, and it caused short-

13 term memory loss. Her short-term memory was still affected. (<u>Id.</u>

14 at 36-37.)

15    She had a lesion on her right brain; two mini-strokes; sugar

16 diabetes; and GERD, or acid reflux disease, that caused constant

17 diarrhea and that was worsened by the medicine that she took for

18 it. (<u>Id.</u> at 36-37, 39.)

19    She had been diagnosed with carpal tunnel syndrome on her

20 right that she described as being very painful, which weakened

21 her strength and caused things she picked up to slip out of her

22 hand two or three times a week. She could lift no more than ten

23 pounds. (<u>Id.</u> at 50-51.)

24    She experienced dizzy spells two or three times a week if

25 she lay her head to the right side, but she controlled it by

26 turning her head to the left; the doctor told her that the cause

27 was stress. She had pain in her shoulder that went down her right

28 arm and leg, pain in her right hip, and pain in her leg,

4

sometimes in her left leg but mostly the right. Her leg pain came
when she stood or walked a lot, or when she took bus trips and
her feet did not touch the floor. She could stand or walk for ten
to forty-five minutes before she experienced a sharp, aching
pain. Most of her pain was in her lower spine; she had tests
performed by an orthopedist but had not yet received the results.
Sometimes she would fall to the ground when walking without
knowing why; her right leg would go out from under her. She moved
around a lot. (Id. at 37-40, 49-50, 53-54.) Her pain in the back
and leg was excruciating, severe, and intermittent; it was not
eased by anything she could do. (Id. at 45.) However, she also
testified that her back pain was usually every day for four or
five hours, was worse some days than others, and on an average
was ten out of ten in severity; she would take Advil so she did
not have to take other pain medication (Vicodin and Valium) all
the time. Her pain medication helped ease the pain in her back
for three or four hours so that she could move around but did not
alleviate it; she used heat every day, and it helped. (Id. at 51-
52.) Her medication helped her knee pain but did not alleviate
it; lying down, elevating the leg, or putting a pillow or heating
pad under her leg sometimes made it tolerable. She did not like
to take a lot of drugs. (Id. at 52, 55.)

     Plaintiff wore bifocals and needed a stronger prescription
but could not afford it; her difficulty judging distance caused
her not to drive. (Id. at 44.)

     She suffered hay fever and COPD (chronic pulmonary
obstructive disease), which she described as asthma, bronchitis,
and emphysema; she testified that the first two were probably

5

caused by allergies, but the emphysema was probably caused by her smoking, which was sometimes at the rate of a pack a day. She was short of breath going up stairs. (Id. at 44, 46.)

Plaintiff sometimes had difficulty concentrating. She had no problem following instructions, but sometimes she could not remember what she read. (Id. at 47.)

Plaintiff lived with her boyfriend, awoke early, washed herself, sat down until 9:00 a.m., fixed food, and dressed and bathed herself; she tried to walk but no longer rode her bike; she could wash dishes and read; she had no problems eating but could sleep only five hours a night. (Id. at 40-41, 46, 52.) She could not do heavy vacuuming. (Id. at 56.) Several times a month she had uncontrolled urination at night; her doctor did not know what caused it, and the psychiatrist suggested that it could be stress, but he did not know for sure. (Id. at 53.)

Plaintiff could walk a block or two, or for forty-five minutes, before having to sit down; stand and sit for forty-five minutes to an hour; could lift less than twenty pounds; climb a set of steps if she stopped two or three times; stoop; but she could not bend at the waist, crawl, or kneel without pain, or crouch without falling over. She could close her fists and extend her arms to the front, sides, and over her head. (Id. at 41-43.)

Plaintiff's general practitioner, Dr. Canga, prescribed her medications. She testified that she needed to see a psychiatrist and once saw one, Dr. Jones, who prescribed Effexor for stress, wanted her to talk with him, and advised her to try to be more calm, talk things out, avoid stress, and call him if she had problems. She had another appointment to see Dr. Jones. (Id. at

47-49.)

Side-effects from medication included diarrhea from the medicine taken to treat her diarrhea. (Id. at 49.)

II. Testimony of the Vocational Expert

Vocational expert (VE) William Wetzel testified that he had reviewed Plaintiff's vocational information and testimony at the hearing; he had considered her history of performing day care work, or basically housekeeping (medium, SVP two, unskilled). He was familiar with the regulations defining levels of work in terms of exertion and skill, with the Dictionary of Occupational Titles (DOT), and the selected characteristics defined in the revised DOT.

He opined that a person of Plaintiff's age, education, past relevant work, and with exertional limitations of sitting for four hours, standing and walking or standing for two hours, and walking for two hours, lifting twenty pounds occasionally and ten pounds frequently, unlimited pushing and pulling, moderate limitations in carrying out detailed instructions and getting along with the public, with limited contact with the public, could perform light assembly work with a sit-stand option, DOT 739.687-030, with 97,000 positions eroded to 30,000 because of the sit-stand option. (Id. at 57-58.)

He opined that if one had the same characteristics but exertional limitations of lifting ten pounds occasionally and ten pounds frequently, two hours of standing, two hours of sitting, unlimited pushing and pulling, limited contact with the public but a moderate ability to carry out detailed instructions, the person could perform light assembly work with a sit-stand option,

but it would be eroded sixty-four per cent to 30,000 positions. (Id. at 58-59.) Dizziness that resulted in an inability to maintain adequate pace to complete the task would erode the work capacity entirely. A problem with grasping in the right dominant hand would preclude unskilled sedentary work, particularly assembly work, because both extremities would have to be used on a continuous basis. (Id. at 59-60.)

   III. Medical History

   Dr. Canga diagnosed and treated Plaintiff for sinusitis in February 2001, diabetes type II and hypertension in April 2001, diabetes and dysplasia in June 2001, and sinusitis in July 2001. (Id. at 156-61.)

   On July 9, 2001, Dr. Roger Lewis, M.D. reported to Dr. Canga, Plaintiff's treating physician, that a cervical biopsy revealed high grade cervical displasia/carcinoma. She was scheduled for a diagnostic colposcopy and biopsies. (A.R. 134-35.) A cone biopsy was scheduled, and follow-up appointments were kept through December 2001. (Id. at 127-129, 132-33.) By January 2002, Dr. Lewis reported that a follow-up pap smear of December 27, 2001, was within normal limits, benign, with epithelial cells within normal limits. (Id. at 131, 141.)

   Dr. Canga or providers at Dr. Canga's office treated Plaintiff for bronchitis that was resolving on July 20, 2001; diabetes and COPD (chronic obstructive pulmonary disease) on August 15, 2001; blood in her right eye on October 16, 2001; and a swollen, infected right great toe in November and December 2001. (Id. at 143-45, 147-155.)

   On November 27, 2001, J. Washburn, physician's assistant in

Dr. Canga's office, diagnosed GERD and gave Plaintiff Prevacid samples. (Id. at 146.)

In January 2002, Plaintiff reported to Washburn that she had suffered right knee pain for three weeks. Examination revealed no swelling and good range of motion and crepitus; the diagnosis was poorly controlled diabetes, and tests were ordered for the knee. (Id. at 140 (notes in part illegible).) On January 21, 2002, she reported stress incontinence and was medicated for sinusitis and nasal congestion. (Id. at 139.)

In February 2002, Plaintiff complained of knee and low back pain; COPD was diagnosed, although there were no abnormalities noted in the examination of the HEENT, neck, chest, or heart. (Id. at 138 (notes in part illegible).)

In connection with Plaintiff's history of swelling of the optic nerve, Dr. Byron Lais reported that an MRI of Plaintiff's orbits and brain performed on March 12, 2002, revealed no abnormalities in the orbits, globes, extraocular muscles, optic nerves, intraorbital fat, or sinuses. As to the brain, it was essentially a negative CT scan, and the MRI of the brain showed a solitary, small, nonspecific signal abnormality in the posterior limb of the right internal capsule measuring 4 by 8 millimeters; there were no other cerebral white matter lesions or abnormalities. (Id. at 173-75.)

On March 22, 2002, Dr. James Hankin reported that a lumbar spine MRI taken in connection with her back pain and weakness of the right leg revealed disk desiccation at L4-5 and L5-S1; at L5-S1 there was mild diffuse disk bulge with some narrowing of the left neural foramen, but the right neural foramen and central

canal were patent. There were no significant abnormalities at L1-2, L2-3, or L3-4; mild lateral and left paracentral disk bulge was present at L4-L5, which caused minimal narrowing of the left neural foramen. The central canal remained patent, and the right neural foramen was patent. The impression was mild spondylosis of the lower lumbar spine with no significant abnormality identified. (Id. at 168.)

Plaintiff was examined at the emergency room at Emanuel Medical Center on April 9, 2002, for swollen lips and tongue, slurred speech, headache, and feeling weak. A physician diagnosed transient ischemic attacks and type II non-insulin dependent diabetes. (Id. at 165 (records partially illegible).)

Plaintiff complained to Dr. Canga of low back pain in April 2002. (Id. at 253-54.)

Dr. Douglas Tait reported that an MRI of the brain and orbits taken on April 22, 2002, revealed a normal brain and orbit MRI with and without contrast, unchanged since March 12, 2002. (Id. at 172.)

Dr. Daniel Lee, ophthalmologist, reported to the disability evaluator on August 23, 2002, that in connection with Plaintiff's optic nerve swelling, examinations in March and February, 2002, revealed acuities of 20/30 in both eyes, no evidence of diabetic retinopathy, and inferior arcus scotoma of both eyes, but the left optic nerve was engorged and congested. In April 2002, Dr. Lee found an left optic disc smaller that the right, and advanced visual field loss on both eyes. He was not certain that it was an ocular pathology and had advised Plaintiff to consult with a neurologist. (Id. at 282.)

Dr. Michael D. Hevor, practicing in general neurology and neuromuscular disorders, performed a consultative examination at the request of Dr. Canga on April 25, 2002, in connection with Plaintiff's complaint of dizziness and difficulty with balance and vision. Dr. Hevor was informed of Dr. Lee's finding of swelling of the right optic nerve, the MRI's of the brain and orbits, and of the lumbosacral spine. Plaintiff further reported right facial numbness, right upper extremity weakness, and difficulty with speech and swelling of the tongue. The physical examination was normal. The neurological exam showed pupils that were sluggish to light, poorly visualized fundi and blurring of disk margins bilaterally, and decreased knee jerk and ankle jerks bilaterally. Dr. Hevor opined that it might be ischemic cerebrovascular events (particularly in light of the March 2002 MRI findings on the right posterior limb of the internal capsule), which in turn might be related to small vessel disease from Type 2 diabetes. Further, the visual problem might be either neurodegenerative disease, such as multiple sclerosis or anterior ischemic neuropathy, either from vessel disease from sugar diabetes, but usually seen with patients with chronic hypertension. Dr. Hevor recommended an MRA (magnestic resonance imaging angiography) scan of the carotids for further evaluation. (Id. at 291-93.)

Dr. Hevor reported on May 30, 2002, that he had followed up by MRA and Circle of Willis evaluation with brain MRA. The studies showed no significant carotid vessel disease. Dr. Hevor opined that Plaintiff's symptoms were more related to microvascular disease from her diabetes, and he had reemphasized

11

the need to have tighter control. (Id. at 290.) Test results as
reported by Dr. Michael Tekautz revealed that no stenoses,
aneurysms, or other vascular abnormalities were identified. (Id.
at 289.)

In July 2002, Dr. Lee's findings were similar to those from
the exams in March and February, and the examination of the eye
was unremarkable; acuities were 20/40 in the right and 20/50 in
the left. Dr. Lee recommended consultation with a neurologist
regarding the swelling. (Id. at 176.)

In September 2002, COPD and anxiety were assessed, and Dr.
Canga prescribed Paxil. (Id. at 250.)

On October 3, 2002, Dr. Nicholas Butowski, a senior resident
in neurology, performed a comprehensive neurologic evaluation.
(Id. at 177-82.) Dr. Butowski had reviewed the results of the
MRI's of the brain, orbits, and lumbar spine as well as Dr. Lee's
note of August 3, 2002. Plaintiff had complained of memory
problems, worsening vision (diplopia up to four to five times a
day for seconds at a time, with spontaneous remittance, with
associated dizziness), and falling down when feeling light-
headed. Plaintiff complained of short-term memory problems but
could not give examples on her own, although she responded
affirmatively when asked if she lost her keys or wallet. She
reported a history of getting lost and wandering off; she had no
history of difficulty with language, following commands, or
disorientation in conversation, although she repeated
conversations. She denied falling or crashing into things,
blacking out, headaches, swallowing, speaking, movement,
numbness, or tingling. Her medications were Glucophage, Celebrex,

12

Actos, Prevacid, Amaryl, Ibuprofen, Aramothozine, Pravachol, Albuterol, Paxil, Spironolactone, Diphenoxylate, and Diazepam. She denied any psychiatric history.

Physical examination revealed that her bifocals improved her vision in both eyes from 20/200 to 20/50; funduscopic exam was within normal limits, pupils were equal, round, and reactive, and extraocular movements were intact. Neck, chest, lungs, cardiovascular, and pulses were normal, with regular rate and rhythm; the abdomen revealed moderate obesity. Her gait, coordination, and station were normal. Her lumbar flexion was to seventy degrees secondary to obesity.

A mini mental status exam resulted in a score of 29 out of 30, missing a point for 2 of 3 at five minutes. However, she could name only six animals in sixty seconds and could make only two words in sixty seconds. She exhibited tearful, pressured speech during these tasks, saying that her memory would not allow her to do them.

Examination of all joints revealed that there was no evidence of muscle spasm, tenderness, crepitus, effusion, or deformity. Her motor strength was 5/5 throughout with normal bulk and tone. The sensory exam was without deficit. Reflexes were 1+ throughout except for the Achilles, which were absent throughout, and plantar responses were observed bilaterally. There was a left peripheral seventh nerve lesion and poor dentition; otherwise, cranial nerves were within normal limits.

Dr. Butowski concluded that there were no objective findings of memory or vision problems. He opined that Plaintiff could stand and/or walk without restriction, sit without restriction,

13

lift and/or carry objects without restriction, and proceed
without postural or manipulative limitation. She might be limited
environmentally as to visual subjective complaints. He suggested
that neuropsychological testing might determine if there was an
underlying clinical dementia; the only difficulty he saw was word
generation, which was confounded with emotional upset. (Id. at
177-82.)

On October 9, 2002, Dr. Laurie R. Weiss, Ph.D., conducted a
psychological disability evaluation of Plaintiff. (Id. at 183-
85.) Plaintiff reported that she could take the bus by herself,
and perform light household chores such as mopping the floors,
doing laundry, and cooking; however, inability to carry weight
precluded her from shopping. Plaintiff reported being stressed
and having memory problems; she had been taking Paxil for three
weeks, and it helped reduce but not eliminate her stress. She did
not report depression. She had never participated in outpatient
psychotherapy and had not been hospitalized for any psychiatric
reason. Dr. Weiss reviewed the MRI and CT brain scans.

Plaintiff was adequately groomed, oriented times three, and
lethargic; speech was clear and coherent, thought process logical
and linear, mood mildly depressed, and affect labile; there were
no delusions, hallucinations, or other signs of a thought
disorder. Testing (Wechsler Adult Intelligence Scale-III,
Wechsler Memory Scale-III, Trail-Making Test, Part A & B, and
Bender-Gestalt Test) revealed adequate concentration, attention
and memory skills; grossly intact remote memory; adequate short-
term memory; ability to calculate simple math problems in her
head; adequate problem-solving ability with difficulty answering

questions requiring abstract reasoning; poor general fund of information; and slow pace and adequate persistence. Her verbal IQ was 77, performance scale IQ 72, and full scale IQ 72, which were in the borderline range. Her auditory and visual memory were in the lower limits of the low average range; the tests did not indicate gross brain dysfunction. Her cognitive functioning revealed no significant deficits, and she was able to understand, remember, and carry out simple, detailed, and complex instructions; she could manage her finances and could concentrate and attend adequately. She had some difficulty interacting with the examiner because of lability and depression. She presented as being depressed and was labile, easily breaking into tears.

Dr. Weiss's diagnosis was Axis I: 311.00 depressive disorder, NOS; Axis II: V62.89 borderline intellectual functioning ; and Axis III: deferred to medical opinion. (Id. at 183-85.)

In December 2002, Dr. Lee examined Plaintiff, who still complained of blurred vision; fundus exam showed small optic nerve cups on both eyes and raised nerve fiber layers along the rim of the left. Dr. Lee was interested in the opinion of a second neurologist that Plaintiff was going to see; he would repeat his visual threshold fields at a follow-up exam scheduled for March 25, 2003. (Id. at 283.)

In December 2002, Plaintiff was short of breath and suffered wheezing, coughing, and sinus congestion. (Id. at 247.)

In 2002 and 2003, blood tests revealed high blood glucose levels. (Id. at 258-66.)

At an unknown date, Dr. Canga indicated in a chart that

1  Plaintiff's chronic illnesses included GERD, diabetes type 2,

2  Bell's palsy, diverticulitis, memory loss of unknown origin,

3  anxiety, and optic neuritis. (Id. at 246.)

4      Dr. M. Gollub, a state agency physician, reviewed

5  Plaintiff's records on October 24, 2002, and concluded that

6  Plaintiff's diabetes rendered Plaintiff able to lift fifty pounds

7  occasionally, twenty-five pounds frequently, stand and/or walk

8  and sit for about six hours in an eight-hour workday; engage in

9  unlimited pushing and pulling in both the upper and lower

10 extremities; frequently climb, balance, stoop, kneel, crouch, and

11 crawl; and there were no manipulative, visual, communicative, or

12 environmental limitations other than to avoid concentrated

13 exposure to hazards such as machinery and heights. (Id. at 196-

14 203.)

15     On November 19, 2002, Dr. Kenneth D. Michael, a state agency

16 psychiatrist, reviewed Plaintiff's records and concluded that

17 Plaintiff could understand, remember, and carry out short and

18 simple instructions, concentrate and attend for extended periods,

19 perform activities within a schedule, sustain an ordinary routine

20 without special supervision, and work in coordination with others

21 without being distracted by them. Plaintiff was moderately

22 limited in the ability to understand, remember, and carry out

23 detailed instructions and in the ability to interact

24 appropriately with the general public. She had some limitation

25 with detailed tasks and limitations with public contact; she was

26 able to perform simple, repetitive tasks. (R.T. 204-07.)

27     Dr. Michael completed a psychiatric review technique on

28 November 19, 2002, finding an affective disorder in the nature of

depression NOS, borderline intellectual functioning, with mild restriction of activities of daily living and in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace; he concluded that a combination of depressed mood and borderline functioning might make detailed tasks difficult, and that her ability for simple, repetitive tasks may limit her public contact. (Id. at 208-21.)

On January 21, 2003, Dr. Hevor performed motor nerve conduction testing of Plaintiff regarding paresthesias in the right extremities. He found mildly prolonged median distal sensory latency with slow sensory nerve conduction velocities over the right wrist. His conclusion was mild right carpal tunnel syndrome. (Id. at 285-88.)

On March 12, 2003, Dr. John Martin opined that an x-ray of Plaintiff's knees taken that day was negative; mineralization was within normal limits; there was no recent or past fracture deformity, joint effusion, opaque loose body, or chondrocalcinosis; joint spaces were fairly well maintained with no significant arthritic changes demonstrated. (Id. at 302.)

Plaintiff submitted her medications in response to the ALJ's request at the hearing held on March 17, 2003. She listed Advil (in place of Vicodin on occasion); Celebrex, 200 mg. daily; Diovan, 80 mg. daily; Praxachol, 20 mg. daily; Sprionolact/HCts. 25/25 daily; Glucovance 1.25/250 mg. twice daily; Amaryl, 4 mg. daily; Actos, 30 mg. thrice daily; Diphenoxylate/atro Lomotil tablets, one tablet every six hours; Neurontin, 300 mg., weekly doses differing from once daily to four times daily; Diazepam, 5 mg., Valium 5 mg., one tablet every eight hours as needed for

anxiety; Effexor, 75 mg., once a day. (Id. at 234-35.)

Dr. Canga completed a complete medical report (physical) on April 3, 2003, indicating a treatment history of pain medication for pain in the dorsals and tender L4, L5, and S1; lab findings noted were severe lumbar pain; the diagnosis was lumbar radiculopathy, diabetes type II, depression and COPD; response to treatment had been minimal, and the prognosis was poor. He opined that Plaintiff could occasionally lift and carry up to ten pounds, sit, stand, and walk an hour each at a time without interruption; and frequently use the left and right hand for simple grasping and generally; occasionally climb and balance, and never stoop, crouch, kneel, or crawl; occasionally reach and push and pull, and continuously handle, feel, hear, and speak; and was restricted from heights, moving machinery, chemicals, humidity, extremes of temperature, fumes, and vibration due to her lumbar pain and COPD. (Id. at 297-301.)

SCOPE AND STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The Court must consider the record

18

as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

ANALYSIS

I. Disability

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which

has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities; 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations; 4) whether the applicant has sufficient residual functional capacity, defined as what an

individual can still do despite limitations, to perform the
applicant's past work; and 5) whether on the basis of the
applicant's age, education, work experience, and residual
functional capacity, the applicant can perform any other gainful
and substantial work within the economy. See 20 C.F.R. § 416.920.

II. Treating Physician's Opinion

Plaintiff argues that the ALJ failed to state adequate
reasons for rejecting the opinion of Dr. Hevor, a treating
neurologist, regarding Plaintiff's having multiple limitations
that precluded prolonged activities, including the use of her
hands and full-time work. The pages to which Plaintiff cites in
support of this assertion contain one report of Dr. Hevor, and a
report of Dr. Canga. Not complying with paragraph 11 of the
Court's scheduling order that issued on March 9, 2004,
Plaintiff's argument does not explain the application of the
legal authority to the facts of the particular case; indeed, the
argument does not address the ALJ's treatment of the treating
doctors' opinions, but merely suggests that because the exhibit
list labels "this opinion" (again, which opinion is not clear) as
a memo, the ALJ must have missed it. The Court notes that
Plaintiff's brief further fails to comply with paragraph 11 of
the Court's scheduling order that issued on March 9, 2004,
because it contains no summary of the facts and testimony or the
administrative findings. Perhaps this defect contributed the an
apparent misapprehension of the facts on the part of Plaintiff.[1]

---

[1] The Court further notes that Plaintiff's brief fails to comply with Local Rule 7-130(d), which requires that each page of documents filed with the Court be numbered consecutively at the bottom and shall provide a brief description of the document on the same line.

1    Dr. Hevor's letters on pages 290-293 of the administrative

2  record noted Plaintiff's complaints of dizziness, difficulty with

3  balance and vision, right facial numbness, right upper extremity

4  weakness, and difficulty with speech and swelling of the tongue.

5  However, Dr. Hevor's examinations were normal aside from pupils

6  that were sluggish to light, poorly visualized fundi and blurring

7  of disk margins bilaterally, and decreased knee jerk and ankle

8  jerks bilaterally. Dr. Hevor's suggestion that it might be

9  ischemic cerebrovascular events or neurodegenerative disease was

10  apparently negated by the results of the subsequent MRA scan of

11  the carotids and Circle of Willis evaluation that showed no

12  significant carotid vessel disease. Dr. Hevor finally opined that

13  Plaintiff's symptoms were more related to microvascular disease

14  from her diabetes, and he reemphasized the need to have tighter

15  control of her diabetes. (Id. at 290.) This opinion does not

16  constitute an opinion that Plaintiff had multiple limitations

17  precluding full-time work; on the contrary, it posits no

18  functional limitations, and it tends to show that Plaintiff's

19  subjective claims stem from a failure to control her diabetes.

20    If Plaintiff meant to refer to Dr. Canga's post-hearing

21  report of April 3, 2003, Plaintiff misrepresents the text and

22  substance of the ALJ's decision. Contrary to Plaintiff's claim,

23  the ALJ did not completely ignore reporting the decision or

24  giving bases to reject it. The ALJ stated:

25       The record also contains an assessment, submitted by
        the claimant's physician, which indicates that the
26       claimant's ability to perform the demands of work is
        limited (Exhibit 14F). However, the record, including
27       office notes from this physician, do not contain any
        objective findings which support this opinion. Moreover,
28       it appears that this assessment is speculative, and

22

1
2

> is primarily based on the claimant's report of her
> limitations. Therefore, the Administrative Law Judge
> rejects this opinion.

3 (A.R. at 24.)

4 An ALJ may disregard a treating physician's opinion that is

5 controverted by other opinions only by setting forth specific,

6 legitimate reasons for doing so that are based on substantial

7 evidence in the record. Rodriguez v. Bowen, 876 F.2d 759, 762

8 (9th Cir. 1989). This burden is met by stating a detailed and

9 thorough summary of the facts and conflicting clinical evidence,

10 stating the interpretation of the evidence, and making findings.

11 Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir 1986). A failure to

12 set forth a reasoned rationale for disregarding a particular

13 treating physician's findings is legal error. Cotton v. Bowen,

14 799 F.2d at 1408.

15 The medical opinion of a nontreating doctor may be relied

16 upon instead of that of a treating physician only if the ALJ

17 provides specific and legitimate reasons supported by substantial

18 evidence in the record. Id. at 1202, citing Lester v. Chater, 81

19 F.3d 821, 830 (9th Cir. 1995). The contradictory opinion of a

20 nontreating but examining physician constitutes substantial

21 evidence, and may be relied upon instead of that of a treating

22 physician, where it is based on independent clinical findings

23 that differ from those of the treating physician. Andrews v.

24 Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). The opinion of a

25 nontreating, nonexamining physician can amount to substantial

26 evidence as long as it is supported by other evidence in the

27 record, such as the opinions of other examining and consulting

28 physicians, which are in turn based on independent clinical

1   findings. <u>Andrews v. Shalala</u>, 53 F.3d at 1041.

2       Here, the ALJ expressly found that Plaintiff's subjective

3   complaints of disabling limitations were not fully credible or

4   substantiated by medical evidence and consistent with the record

5   as a whole; he concluded that Plaintiff could perform light work.

6   (A.R. at 24-25.) Plaintiff does not challenge the sufficiency of

7   the evidence supporting the ALJ's credibility finding or the

8   adequacy of the ALJ's reasons given to explain the finding. The

9   Court notes that the ALJ provided specific, cogent, clear, and

10  convincing reasons for rejecting specifically described

11  subjective complaints of musculoskeletal pain, complications of

12  diabetes, diarrhea, visual issues, and mental impairment. (A.R.

13  at 24-25.)

14      The fact that an opinion is based primarily on the patient's

15  subjective complaints may be properly considered. <u>Matney on</u>

16  <u>Behalf of Matney v. Sullivan</u>, 981 F.2d 1016, 1020 (9th Cir.

17  1992). Where a treating source's opinion is based largely on the

18  Plaintiff's own subjective description of his or her symptoms,

19  and the ALJ has discredited the Plaintiff's claim as to those

20  subjective symptoms, the ALJ may reject the treating source's

21  opinion. <u>Fair v. Bowen</u>, 885 F.2d 597, 605 (9th Cir. 1989). It was

22  appropriate for the ALJ here to reject Dr. Canga's assessment

23  because the record supports the ALJ's conclusion that Dr. Canga's

24  assessment was speculative and was primarily based on Plaintiff's

25  subjective complaints.

26      A conclusional opinion that is unsubstantiated by relevant

27  medical documentation may be rejected. See <u>Johnson v. Shalala</u>, 60

28  F.3d 1428, 1432-33 (9th Cir. 1995). It is appropriate for an ALJ

24

to consider the absence of supporting findings, and the
inconsistency of conclusions with the physician's own findings,
in rejecting a physician's opinion. <u>Johnson v. Shalala</u>, 60 F.3d
1428, 1432-33 (9th Cir. 1995); <u>Matney v. Sullivan</u>, 981 F.2d 1016,
1019 (9th Cir. 1992); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th
Cir. 1989). Dr. Canga's notes do not contain objective findings
that support his opinion regarding Plaintiff's abilities.

Further, the remainder of the record, which the ALJ referred
to as a basis for rejecting Dr. Canga's limitations, and which
the ALJ reviewed in some factual detail, contained evidence that
contradicted Dr. Canga's limitations: spinal and knee x-rays that
revealed no significant abnormality and reflected only mild
spondylosis (A.R. at 23, 25); lack of treatment (beyond
medication) for diabetes, diverticulitis, diarrhea, and
musculoskeletal pain (<u>id.</u>); relatively unremarkable visual
examinations with visual acuity at 20/40 and 20/50 in July 2002
(A.R. at 23, 25); lack of end-organ damage, serious neuropathy,
or significant visual problems from diabetes that was controlled
with medication alone (A.R. at 25); failure to report any
ineffectiveness or side-effects of medication (A.R. at 25);
independence in activities of daily living (<u>id.</u>); absence of
weight loss from diarrhea (<u>id.</u> at 25); and various bases upon
which to reject a claim of limitations from mental impairment
(independence in activities of daily living, only moderate
impairment in maintaining social function with respect to contact
with the public, lack of any indication of impairment of
concentration, persistence and pace in the psychological testing,
absence of any instances of deterioration in a work setting, and

25

the consulting neurologist's finding of no work-related
limitations from memory or visual problems (A.R. at 24-26). As to
the limitation of Plaintiff's use of her right hand or hands only
frequently for simple grasping, and only occasionally for
reaching and pushing or pulling, the ALJ noted the finding of
mild carpal tunnel syndrome (id. at 24), but he concluded that
with respect to musculoskeletal pain, Plaintiff received no
specialized treatment, and no serious neurological involvement
had been found (id. at 25). With respect to Dr. Canga's
environmental limitations of exposure to heights, moving
machinery, chemicals, temperature, fumes, and vibrations, it is
not clear which related precisely to Plaintiff's claimed pain or
concentration symptoms and which to her COPD. Insofar as these
limitations were based on Plaintiff's claimed pain or
concentration problems, the ALJ sufficiently explained his
rejection of the claim of limitations that would preclude light
work and any medical opinion resting on such claims. Insofar as
these limitations were based on Plaintiff's COPD, the record
contained the ALJ's express finding that the record revealed only
treatment for routine ailments without any significant objective
findings or results of diagnostic testing showing that she was
seriously impaired. Substantial evidence supported these
findings.

       Thus, the Court rejects what might be implied in Plaintiff's
inaccurate characterization of the ALJ's treatment of treating
physicians' opinion, namely, an assertion that the ALJ failed to
articulate adequate reasons for rejecting the opinion of Dr.
Canga as to Plaintiff's limitations.

III. <u>Development of the Mental Health Record</u>

Plaintiff argues that because the "lone consultative report and opinion of record was admittedly vague," and because the consulting neurological examiner opined that neuropsychological testing was needed, the ALJ failed to perform his duty to develop the mental health record, and the matter must be remanded for such testing.

The law imposes a duty on the ALJ to develop the record in some circumstances. 20 C.F.R. § 416.912(d)-(f) (recognizing a duty on the agency to develop a medical history, recontact medical sources, and arrange a consultative examination if the evidence received is inadequate for a determination of disability); <u>Brown v. Heckler</u>, 713 F.2d 441, 443 (9th Cir. 1983) (recognizing the ALJ's duty fully and fairly to develop the record even if the claimant is represented by counsel). The duty arises when the record before the ALJ is ambiguous or inadequate to allow for proper evaluation of the evidence. <u>Mayes v. Massanari</u>, 262 F.3d 963, 968 (9th Cir. 2001).

In October 2002, Dr. Butowski, the consulting neurological examiner, opined that there were no objective findings of memory problems. He stated:

> Perhaps neuropsychological testing would more rigorously determine that indeed there is an underlying clinical dementia....
>
> However, neuropsychiatric testing may be prudent to assess whether such mental problems do exist. The only difficulty that I see is word generation, which was confounded with emotional upset.

(A.R. at 181-82.)

Although Dr. Butowski suggested that further testing could

1  help assess if Plaintiff had dementia, the suggestion was

2  tentative. Nevertheless, a psychological evaluation by Dr. Weiss

3  ensued. That evaluation further developed the record regarding

4  Plaintiff's functioning to a point that an assessment could

5  validly be made.

6      Dr. Weiss, a psychologist, reviewed Plaintiff's negative MRI

7  and CT brain scans. Dr. Weiss considered Plaintiff's reports of

8  stress and memory problems and her lack of history of therapy or

9  hospitalization. Dr. Weiss administered tests to measure

10 Plaintiff's intelligence, memory, concentration, attention, pace,

11 persistence, and problem-solving ability. Dr. Weiss ruled out

12 gross brain dysfunction, thought disorder, and significant

13 deficit in cognitive functioning, including memory. She opined

14 that Plaintiff "had some difficulty interacting with this

15 examiner because of her lability and depression." However, Weiss

16 also rendered an affirmative opinion that Plaintiff suffered from

17 a depressive disorder and borderline intellectual functioning.

18 (A.R. at 183-85.)

19     In his analysis of Plaintiff's mental status for impairment,

20 the ALJ expressly evaluated all elements of function required to

21 be considered under 20 C.F.R. § 416.920a. In evaluating

22 Plaintiff's difficulty in maintaining social functioning, the ALJ

23 noted that Plaintiff had interacted appropriately with

24 interviewers, had been described as cooperative, and that no

25 examining source had indicated any serious impairment in this

26 area. (A.R. at 25-26.) However, the ALJ noted that a psychologist

27 had "suggested some impairment" in the area of maintaining social

28 functioning. (A.R. at 26.) Therefore, the ALJ rated the degree of

impairment as moderate and of a type that would preclude work
that required contact with the public. Plaintiff does not assert
that this assessment is not supported by substantial evidence in
the record. The ALJ expressly concluded that this assessment was
supported by clinical findings and was consistent with the
evidence as a whole. (A.R. at 26.) The Court notes that the
clinical findings of the consultants as well as the opinion of
Dr. Michael, the state agency psychiatrist, supports this express
determination. (A.R. at 205-06.) The Court thus concludes that
the evidence was not vague, ambiguous, or inadequate such that a
conclusion on the pertinent issue was precluded.

Thus, it is concluded that there is no indication in the
present case that the record was ambiguous or inadequate to allow
for proper evaluation of the evidence. The ALJ did not err in
failing to develop the mental health record.

IV. Consideration of Combination of Impairments

Plaintiff argues that at steps two and five of the
disability analysis, the ALJ failed to consider all Plaintiff's
impairments.

At step two, the Secretary considers if claimant has "an
impairment or combination of impairments which significantly
limits his physical or mental ability to do basic work
activities." 20 C.F.R. § 416.920(c). This is referred to as the
"severity" requirement and does not involve consideration of the
claimant's age, education, or work experience. Id. The Secretary
is required to "consider the combined effect of all of the
individual's impairments without regard to whether any such
impairment, if considered separately, would be of [sufficient

medical] severity." 42 U.S.C. § 1382c(a)(3)(F).

Basic work activities include the abilities and aptitudes necessary to do most jobs, such as physical functions of walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b).

An impairment or combination thereof is not severe when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.921(a); Soc. Sec. Ruling 85-28; Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996).

In determining whether an individual's impairments are of sufficient medical severity that they could be the basis of eligibility for benefits, the Commissioner shall consider the combined effect of all the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 416.945(3); Soc. Sec. Ruling 96-8p. The ALJ is responsible for determining the effect of an impairment upon the other impairments and its effect on the claimant's ability to work and general health. Celaya v. Halter, 332 F.3d 1177, 1182 (9th Cir. 2003). An ALJ must adequately explain his evaluation of the

combined effects of impairments. <u>Marcia v. Sullivan</u>, 900 F.2d
172, 176 (9th Cir. 1990). The Ninth Circuit has cautioned that
despite its holding in <u>Celaya v. Barnhart</u>, 332 F.3d 1177, 1181
(9th Cir. 2003), it remains the burden of a claimant to furnish
evidence that her impairments, in combination, caused functional
limitations. <u>Burch v. Barnhart</u>, 400 F.3d 676, 681-83 (9th Cir.
2005).

Here, the ALJ concluded that Plaintiff had severe
impairments of diabetes, depressive disorder, and borderline
intellectual functioning. (A.R. at 23 27.) However, the ALJ
reviewed Plaintiff's other claimed impairments with respect to
their impact upon Plaintiff's ability to perform work activities.
The ALJ expressly concluded that the record did not contain any
objective evidence that showed that Plaintiff could not perform
the light work jobs enumerated by the VE. (<u>Id.</u> at 23.) The ALJ
noted negative objective test results with respect to Plaintiff's
symptoms of the back, leg, knee, and optic nerves, and the lack
of impairment by diabetes and diverticulitis; he noted only mild
carpal tunnel syndrome, and no demonstrated limitation in visual
acuity. (A.R. at 23-25.) The ALJ specifically noted the
comprehensive neurological evaluation in October 2002 that was
normal and after which Dr. Butowski opined that Plaintiff had no
work-related limitations. (<u>Id.</u> at 24.) The ALJ reviewed the
psychological and neurological examinations of Plaintiff's mental
condition and concluded that the only functional limitations
appearing were moderate difficulty in maintaining social
functioning with respect to interacting with the public, and mild
deficiencies in concentration, persistence and pace. (<u>Id.</u> at 25-

26.) The ALJ then forumulated his RFC with an express reference to consideration of all the reports of record and the impact of all the claimant's impairments on her ability to perform work. (Id. at 26.)

As to Plaintiff's COPD, GERD, and dysplasia, the ALJ noted in the course of analyzing Plaintiff's severe impairment of diabetes that there was no objective evidence in the record that showed that Plaintiff could not perform light work, and he stated that office notes in 2001 only showed:

> ...that the claimant was seen with routine ailments, and do not contain any significant objective findings or the results of diagnostic testing which show that she is seriously impaired.

This finding clearly reflects that he had considered the routine ailments, which included dysplasia, sinusitis, COPD, resolving bronchitis, and GERD, and had concluded that there were no significant objective findings or diagnostic results revealing any severity of impairment or functional limitation. The record supports these findings.

With respect to the TIA, there was evidence of transient ischemic attacks in April 2002, and there was Dr. Hevor's opinion that Plaintiff might have ischemic cerebrovascular events. However, the MRA showed no significant vessel disease, and Dr. Hevor instead found microvascular disease from diabetes; Dr. Tekautz's reports revealed no stenoses, aneurysms, or other vascular abnormalities. Dr. Hevor's opinion that diabetes was involved was expressly noted by the ALJ, who relied on the opinion in assessing Plaintiff's ability to work. (A.R. at 23.)

It is also clear that the ALJ was aware of Plaintiff's

obesity and concluded that it did not result in any impairment of Plaintiff's ability to work. In analyzing her diarrhea, the ALJ noted her height of 5'1"" and weight of 225 pounds, and noted that she had not reported any significant weight loss to any examining source. (A.R. at 25.) In another portion of the decision, the ALJ noted and placed weight on Dr. Butowski's neurological evaluation and his conclusion that Plaintiff did not have any work-related limitations. (A.R. at 23-24.) Dr. Butowski noted Plaintiff's abdomen for moderate obesity and that her obesity affected her flexion in the lumbar region. (A.R. at 180.) However, he found that she had no muscle spasm, tenderness, crepitus, effusion, or deformity; her motor strength was 5/5 throughout, with normal bulk and tone. He expressly concluded that she could sit, stand, and/or walk, and lift and carry objects without restriction; she had no postural or manipulative limitations. (A.R. at 181-82.)

As to Plaintiff's COPD, there was substantial evidence to support the ALJ's conclusion that the impairment, if any, was routine, and the records supported the finding that there was no objective evidence that Plaintiff could not perform light work. Plaintiff was seen twice in 2001 for sinusitis, COPD, or resolving bronchitis; she suffered sinusitis and congestion in January 2002, and COPD in February and September 2002. In October 2002 Dr. Butowski at the consultative exam found a normal chest and lungs. In December 2002, Plaintiff suffered shortness of breath, wheezing, coughing, and sinus congestion. The record reflects sporadic problems of a routine nature without any evidence of escalating treatment or a precise limitation of

1  function.

2      This is not a case in which it appears that the ALJ failed
3  to consider the combined impairments suffered by the Plaintiff;
4  rather, it is one in which the ALJ undertook a relatively
5  thorough review of the medical evidence and expressly and
6  carefully reviewed almost every alleged impairment; noted the
7  absence of evidence of severity, or credited evidence which
8  supported a conclusion that the impact of the impairments was not
9  severe; and expressly concluded in terms of the impact of all the
10 claimant's impairments on Plaintiff's ability to work. It is
11 clear in this instance that by implication, the ALJ found that
12 Plaintiff's other claimed impairments were not severe. See Smolen
13 v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). Although the ALJ
14 did not make separate, express findings with respect to each
15 impairment in question, it is reasonably clear that he considered
16 the pertinent diagnoses and concluded, based on the evidence that
17 he cited in the decision, that Plaintiff's condition was not
18 severe. In the unique circumstances of the present case, it is
19 not necessary for the ALJ to have expressly separated out the
20 various routine ailments concerning which the evidence did not
21 demonstrate any impairment of Plaintiff's ability to work.

22     In summary, the Court concludes that Plaintiff has not shown
23 that the ALJ failed to consider all Plaintiff's impairments.

24     V. Listings 9.08 and 12.05B

25     Plaintiff argues that the ALJ failed to evaluate Plaintiff's
26 condition under Listing 9.08 (diabetes) and 12.05B (mental
27 retardation).

28     With respect to diabetes, after finding that Plaintiff did

34

not show an impairment or combination thereof that met or equaled a listing, the ALJ stated:

> Specifically, the Administrative Law Judge gave consideration (sic) 9.08 of the Listing of Impairments. Although the claimant has diabetes, the record does not show neuropathy and the persistent disorganization of motor function in two extremities contemplated by this listing.

(A.R. at 23.)

It is Plaintiff's burden to establish that his impairment met a listing. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). Mere diagnosis of a listed impairment is not sufficient to sustain a finding of disability; there must also be the findings required in the listing. Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 416.925(d). Generally, specific medical findings are needed to support the diagnosis and the required level of severity. 20 C.F.R. §§ 404.1525(c)-(d), 416.925(c). The Commissioner is not required to state why a claimant failed to satisfy every different section of the listing of impairments; rather, it is sufficient to evaluate the evidence upon which the ultimate factual conclusions are based. Otherwise, an undue burden would be put on the social security disability process. Gonzales v. Sullivan, 914 F.2d 1197, 1200-01 (9th Cir. 1990).

The ALJ expressly found that Plaintiff did not meet listing 9.08, which requires diabetes mellitis with neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (9.08(A)), or acidosis of a stated frequency, or retinitis

proliferans. The evidence, as previously set forth, supported his finding.

With respect to mental retardation, as previously noted, the ALJ was not required to make an express finding. Plaintiff never submitted a diagnosis of mental retardation. Further, Listing 12.05 requires specific symptoms, many of which were not demonstrated by Plaintiff, including significantly sub-average general intellectual functioning with deficits initially manifested before age 22; and either dependence upon others for stated functions or inability to follow directions such that use of standardized measures of intellectual functioning is precluded; a valid verbal, performance, or full scale IQ of 59 or less; or a valid verbal, performance, or full scale IQ of 60 through 70 and either another impairment imposing significant work-related restrictions, or marked restriction of activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace.

The medical evidence of record was devoid of this requirements. The ALJ's findings were sufficient, and substantial evidence supported his conclusion.

VI. <u>RFC</u>

Plaintiff argues that the ALJ failed to follow the correct legal standards in formulating Plaintiff's RFC because he did not include all Plaintiff's impairments. She also asserts that the RFC was not supported by substantial evidence, and it was unclear as to how long Plaintiff can be on her feet.

Social Security regulations define residual functional capacity as the "maximum degree to which the individual retains

the capacity for sustained performance of the physical-mental requirements of jobs." Reddick v. Chater, 157 F.3d 715, 724 (9th Cir. 1998) (citing 20 C.F.R. 404, Subpt. P, App. 2 § 200.00(c) and Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1995)). The Commissioner must evaluate the claimant's "ability to work on a sustained basis." Id. (citing 20 C.F.R. § 404.1512(a)); Lester, 81 F.3d at 833); see 20 C.F.R. § 416.945. A "regular and continuing basis" means eight hours a day, five days a week, or an equivalent work schedule. S.S.R. 96-8p at 1, 2.

In assessing a claimant's RFC, it is necessary to consider the limiting effects of all the claimants impairments, even those that are not severe. 20 C.F.R. § 404.1545(a), (e); 20 C.F.R. § 416.945(a), (e); Soc. Sec. Ruling 96-8p at 4; Reddick v. Chater, 157 F. 3d 715, 724 (9th Cir. 1998) (failure to consider non-exertional factor of fatigue that could affect stamina); Beecher v. Heckler, 756 F.2d 693, 694-95 (9th Cir. 1985) (failure to consider a psychiatrist's report regarding a mental impairment). The ALJ must consider all factors that might have a significant impact on an individual's ability to work. Erickson v. Shalala, 9 F.3d 813, 817 (9th Cir.1993); Varney v. Secretary of HHS, 846 F.2d 581, 585 (9th Cir.), relief modified, 859 F.2d 1396 (1988).

Here, as previously discussed[2], the ALJ considered all impairments concerning which he found evidence, which he credited and did not reject, of a significant impact on Plaintiff's

---

[2] With respect to Plaintiff's contention that her hypertension was ignored, Plaintiff cites to Tr. 288. That page concerns Plaintiff's carpal tunnel syndrome. Plaintiff's contention is thus unclear and is not supported by a pertinent citation to the record as required by the Court's scheduling order. Thus, Plaintiff's contention in this regard will not be further separately addressed. However, the Court notes that it does not appear that there was evidence that Plaintiff's hypertension had caused any limitations or was not subject to control.

ability to work. The record thus demonstrates that the ALJ did not fail to include Plaintiff's impairments in his RFC.

Plaintiff complains that the ALJ failed to find any mental restriction to simple, repetitive tasks despite Plaintiff's score of 72 on an IQ test. The ALJ relied on Dr. Butowski's examination of October 2002, at which the doctor concluded that there were no objective findings of memory problems except for word generation, which was confounded with emotional upset. (A.R. at 24.) The ALJ likewise relied on Dr. Weiss's consultative psychological evaluation in October 2002, which engendered Weiss's opinion that Plaintiff had intact memory, attention, and concentration, and the ability to perform the mental demands of work. (Id.) As previously noted, the ALJ rejected Dr. Canga's opinion that Plaintiff was limited, and he did so with the support of substantial evidence in the record. He expressly found that Plaintiff was not limited in her activities of daily living; this was supported by Plaintiff's own testimony and statements.

The ALJ found that based on a psychologist's suggestion, there was moderate impairment in maintaining social functioning, but it was such that would only preclude work that required contact with the public. (A.R. at 26.) This was consistent with Dr. Weiss's findings and Dr. Michael's conclusions. The ALJ also concluded that Plaintiff had only mild deficiencies of concentration, persistence, and pace. This was based on the lack of any serious limitation in this area on the basis of psychological testing, the fact that no examining psychologist had precluded Plaintiff from performing work, and Plaintiff's performance of shopping and housework, handling of her finances,

and taking public transportation, activities which required at least normal amounts of concentration. This is supported by Butowski's and Weiss's findings regarding her concentration, attention, problem-solving ability, and memory. The ALJ found no evidence of deterioration in a work-like setting.

Plaintiff asserts that in failing to limit her to simple tasks, the ALJ ignored the opinions of the state agency physicians regarding Plaintiff's psychological impairment. As previously noted, the ALJ noted Plaintiff's claim that she could not perform work because of memory problems, but he further noted and relied on Dr. Butowski's normal exam and finding that Plaintiff had no work-related limitations; Plaintiff's admitted independence in activities of daily living; and Dr. Weiss's findings of normal thought process, intact memory, attention, and concentration, and her specific finding that Plaintiff could perform the mental demands of work. (A.R. at 24.) He expressly rejected Dr. Canga's more limited assessment because of the lack of objective findings and reliance upon Plaintiff's subjective reports. (Id.) He concluded that Plaintiff's claim of difficulty with memory was not substantiated by the medical evidence or consistent with the record as a whole. (Id.) In evaluating Plaintiff's mental impairment, the ALJ put weight on Plaintiff's cooperation with interviewers in assessing her social functioning, and the lack of any examining source's finding that she was seriously impaired. (A.R. at 25-26.) However, he accepted a psychologist's suggestion of some impairment. (Id.) This is supported by Dr. Weiss's statement that Plaintiff had some difficulty interacting with her because of lability and

depression (A.R. at 185), and by Dr. Michael's conclusion that she was moderately limited, or had some limitation, in her ability to interact with the general public (A.R. at 205-06). The ALJ's conclusion was supported by substantial evidence.

As to a limitation to simple work, the ALJ stated:

> The third area to evaluate is deficiencies of concentration, persistence, and pace. Psychological testing has not reflected any serious limitation in the area, and no examiner has precluded the claimant from performing work. The claimant shops, performs housework, handles her own finances, and take public transportation, certainly activities which require at least normal amounts of concentration. Therefore, the Administrative Law Judge rates the level of impairment in this area as mild.

(A.R. at 26.) The ALJ thus expressly credited the results of the testing and examinations and Plaintiff's own abilities with respect to daily activities. This conclusion is reasonably interpreted as crediting the examining sources over the non-examining state agency physician, particularly in light of the ALJ's previously characterization of the medical evidence and the record as a whole. See Soc. Sec. Ruling 96-6p.

Thus, the Court rejects Plaintiff's assertions that the ALJ's findings regarding Plaintiff's mental condition were inadequate or unsupported by substantial evidence.

Plaintiff argues that the RFC is ambiguous with respect to how long Plaintiff can remain on her feet. In the "Findings" section of the ALJ's decision, the decision indicates that Plaintiff has the RFC for "sitting for 4 hours, standing for 2 hours, and walking for 2 hours, in an 8-hours (sic) day." (A.R. at 27.) In the body of the decision, the ALJ found:

> ...that her impairments prevents (sic) her from sitting for more than 4 hours, standing for more than 2

40

hours, and walking for more than 2 hours, in an 8 hour day."

A.R. at 26. Plaintiff contends that this is unclear because it does not specify whether Plaintiff may be on her feet a total of four hours or two hours. However, these limitations are reasonably interpreted according to their plain meaning, namely, that Plaintiff may stand for two hours and walk for two hours, which would total four hours on her feet.[3]

Finally, Plaintiff contends, "Also, there should be restrictions against hazards." Plaintiff cites to A.R. 288, at which relates to carpal tunnel syndrome. Plaintiff has failed to articulate an argument in this respect.

VII. Disposition

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on proper legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff Leslie Mack.

IT IS SO ORDERED.

---

[3] Plaintiff similarly contends that in posing questions to the VE, the ALJ's description of this limitation was ambiguous. In asking the VE with respect to the RFC that the ALJ ultimately adopted, the ALJ asked the VE to assume that Plaintiff had the ability... to stand and walk or to stand for two hours, to walk for two hours." (A.R. at 58.) The repetition of the two-hour limit for each activity of standing and walking is reasonably understood as meaning that the described person could stand for two hours and walk for two hours. Thus, this statement of the limitation likewise was not ambiguous.

1    **Dated:   April 18, 2006**                    **/s/ Sandra M. Snyder**
     icido3                              UNITED STATES MAGISTRATE JUDGE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28